[No. 36236. Department One. November 1, 1962.]

PATRICK A. SULLIVAN, *Respondent,* v. JOHNNIE B. WATSON
*et al., Appellants.** 

*Rutherford, Johnson & Shinn,* for appellants.

*Dore, Dubuar & Dore* and *James D. Dubuar,* for respondent.

HILL, J.—This is a host-guest case. The jury found the host-driver had been grossly negligent[1] and brought in a verdict of $4,500 for the guest. The trial court refused to

*Reported in 375 P. (2d) 501.

[1]This was implicit in the verdict for the plaintiff, the jury having been instructed that RCW 46.08.080 provides as follows:

"No person transported by the owner or operator of a motor vehicle as an invited guest . . . shall have cause of action for damages against such owner or operator for injuries, death or loss, in case of accident, unless the accident was . . . the result of said . . . operator's gross negligence . . . and unless the proof of the cause of action is corroborated by competent evidence or testimony independent of, or in addition to, the testimony of the parties to the action: . . ."

And that the plaintiff, as a guest, must prove that his injuries were proximately caused by the gross negligence of the defendant driver.

grant a new trial and entered judgment on the verdict. The defendants appeal; their contentions being that there should have been a directed verdict in their favor, and, in any event, that they were entitled to a continuance. (The defendants are husband and wife, but inasmuch as we are concerned only with the actions of the husband, we shall refer to him as though he were the only defendant.)

It was undisputed: that the host-defendant was driving his Pontiac automobile north on 23rd Avenue South in Seattle, near midnight, and the plaintiff-guest was riding in the front seat with him (three of their mutual friends occupied the back seat); that at the Norman-Street intersection there is the beginning of a slight curve; that, after passing that intersection, the car hit the right curb, veered diagonally across the four lanes of traffic, hit the left curb and, as it continued its general northerly course, zigzagged back and forth (there is some dispute as to how many times it zigged and how many times it zagged) while it crossed the Charles, Dearborn, and Lane Street intersections, a distance of three blocks; that, in that distance, two head-on collisions were narrowly averted with south-bound cars; that, just after passing the Lane-Street intersection, the Pontiac went over the curb (on its left side of the street), ran into a fence set in a two-foot-high concrete foundation (referred to as a bulkhead), hit the front of a house, and wound up broadside of a telephone pole and entirely off the street; that the plaintiff-guest sustained severe injuries in consequence of the sudden stopping of the forward progress of the car when it hit the fence and cement foundation, the house, and the telephone pole.

That driving an automobile in that manner, all must agree, is grossly, if not wantonly, negligent in the absence of some reasonable justification.

The host-defendant was not present at the trial, but his deposition was read to the jury. In explanation of the beginning of these wild maneuverings, he said that while driving north on 23rd Avenue South—just before he entered the curve at the Norman-Street intersection — he

looked at his speedometer and he "was between 25 and 29," and

". . . just as I got around the curve, well, the car kind of raced the motor and kind of picked up speed. . . . And then when she went to the right . . . and I was trying to get it back in the middle of the road."

". . . And she went over to the left and she just kept going from right to left all the time, and I was taking my feet trying to pull the gas pedal up."

He further said that the gas pedal was not stuck down, but that it was "snapped off," and "the car was gradually picking up speed"; and, further, that while "these two other cars were approaching me, I was still going from one side to the other. . . . I had to cut, swing from right to left the way it was going from one side to the other . . . *After I missed the two cars I kept it on the right side.*" (Italics ours)

Nobody was hurt up to this point. The host-defendant's explanation of the collision with the fence and its concrete foundation, the house, and the telephone pole was:

". . . I guess my power steering went out on me and she went back over to the left on the side of the walk where the house was . . . I was on the left side, and I just couldn't hold it any longer, so she went out to the side of the curb and shaved the house and the right hand fender, I guess, was up against the post."

There was corroboration that the gas pedal was off; but there was no attempt at corroboration "that the power steering went out on me," though the host-defendant testified:

"The two officers that gave me the ticket, they checked the car and the car was checked where they had it towed, and it was checked at Central Pontiac."

The explanation given by the host-driver, if believed by the jury, exculpated him from gross negligence and made any negligence questionable. His failure to turn off the ignition, use the automatic gearshift, or apply the brakes could be excused by reason of the emergency with which he was confronted.

But there was another version of this accident, that the jury was entitled to believe, given by a disinterested witness (then a university student) who was the driver of one of the south-bound cars which barely avoided a head-on collision with defendant's car. He saw that car's initial contact with the curb, on the curve just beyond the Norman-Street intersection. His version differs from the safe, sane, and legal approach to the curve at the Norman-Street intersection testified to by three of the occupants of the car including the plaintiff and host-defendant. It will be remembered that they fixed the beginning of the zigzag course north on 23rd Avenue South with the initial contact with the curb on the east side of the street, somewhat to the north of the Norman-Street intersection.

The driver of the south-bound car testified that he saw the host-defendant's car coming at what appeared to be a "pretty fast pace" around the "S" curve at Norman Street.

". . . I would say it was exceeding the speed limit quite a bit because it didn't seem to be able to make the turn at all . . . from my position between Dearborn and Charles Street the car appeared to come from the other side of the street [the west side] and hit the curb [on the east side of 23rd Avenue South]."

The jury might well have concluded that excessive speed caused the initial contact with the curb, which threw the car out of control.

Mr. Powers testified further concerning the progress of the defendant's car up 23rd Avenue South:

". . . I had progressed to just south of Charles Street and the car hit the curb, shot across the street and I pulled up on the curb completely off the street . . . but the car hit the curb directly in front of me, about a car and a half length in front of me. [This was on the west side of 23rd Avenue South.] . . . It shot back across the street and seemed to hit the curb again, I am not too sure whether it did or not. . . . I opened my car door and watched the car go back and forth, back and forth, all the way up the street, no brakes, lights, or anything. Dust flew up. I turned around and we went back to the accident. . . ."

He testified further that the host-defendant's car was traveling 45 to 50 miles an hour when it passed him.

Mr. Powers' condensed testimony, as to what happened after the accident, was as follows:

". . . Mr. Sullivan was leaning on the hood of the car with his face on his hands. At that time I helped him off the hood of the car and laid him on the sidewalk and gave him a cigarette. He mumbled something, I wasn't too clear on what it was, and he passed out or seemed to black out. A little while later he woke up and then blacked out again. . . ."

"At this time I looked over at the car and Mr. Watson was reaching in the automobile underneath the seat and threw a bottle of Gilbey's gin into the bushes."

". . . a Gilbey's gin bottle is very easily recognized. It's a frosted bottle and it has a little diamond that says 'Gilbey's' on it. I saw him pull it out of the car. I was just on the other side of the car. I had gone back to see if there was anything wrong after I took Mr. Sullivan off the front of the car. I went back and looked inside of the car and saw Mr. Watson reaching down right in front of the seat and he pulled the bottle out and tossed it over his shoulder into the bushes behind where the fence had been knocked down."

"The police arrived shortly after and Mr. Watson was standing at the side of the police car and he said, 'My accelerator pedal started sticking about a block away from here,' and he was talking about the place where he hit the telephone pole. I was standing there and I told the policeman that I was a witness and it didn't seem as though his accelerator pedal stuck a block away because he was going a terrific speed when he rounded the curve and kept gaining speed all the way to the scene of the accident."

"After I told the policeman that I saw the accident and would be available for any information, Mr. Watson began to get mad at me and started to follow me down the street using rather rough terms and everything, and one of the policemen got out of the car and grabbed him and put him in the police car and told me to go on my own way."

It is apparent either that the jury did not accept the host-defendant's version of what caused his car to hit the curb on the curve at the Norman-Street intersection, which

precipitated the wild three-block drive; or, if they did accept it, they did not believe that "his power steering went out on him," which was his explanation of what caused the final gyrations which terminated against the telephone pole and occasioned the plaintiff's injuries.

We are satisfied that there was a case for the jury, and that the negligence, if any, was gross. The trial court did not err in refusing to direct a verdict for the host-defendant.

The other assignments of error have to do with the trial court's refusal to grant a continuance, because the host-defendant and a witness under subpoena (one of the three passengers in the back seat of the host-defendant's car) were not present at the time of trial.

It developed that both the host-defendant and his witness were members of the Coast Guard, and that their boat sailed from Seattle on the morning of the trial.

The host-defendant had earlier been granted a "day of the trial" continuance because he had been injured in an automobile accident on the eve of the trial. At that time a trial day was fixed to suit his convenience. On the second trial date, the plaintiff and his witnesses were again present and waiting to go to trial. On the motion by the host-defendant's counsel for a second continuance, the trial judge—being advised that the defendant's deposition was available and it appearing to the trial court that, conceding the materiality of the testimony of the host-defendant and his missing witness, it was still not apparent that any diligence had been exercised in an effort to have them available—refused the continuance.

If, in the course of the trial, any prejudice had been shown as a result of this ruling, a different problem might be presented; but even on the motion for a new trial there was no showing as to anything that the defendant could, or would, have said not covered by his deposition; nor is there any showing as to what the missing witness could have added to the testimony before the jury.

The host-defendant urges that live testimony is more effective than depositions. Concededly it is more desirable;

but, viewed either at the time or retrospectively, we see no abuse of the trial court's discretion in refusing a continuance under the circumstances of this case.

This disposes of the contentions[2] that there was no substantial evidence to sustain the verdict and that, in any event, a continuance should have been granted. On the basis of the record before us, we affirm the judgment.

FINLEY, C. J., WEAVER, ROSELLINI, and FOSTER, JJ., concur.

---

[2]There is, however, another matter suggested in the appellants' brief which calls for a somewhat extended comment. The appellants, in their brief, quote the trial judge as saying:

". . . a trial judge no longer has the right to grant a new trial because he believes substantial justice has not been done because the verdict is overwhelmingly contrary to the weight of the evidence."

He is also quoted as saying:

"The motion for new trial will be denied solely because I have no power to grant it. If I had the power to grant it, I would. . . ."

These statements are not in the record and appear only in the brief. There is before us only an order denying a new trial "for the reasons orally stated at this time," with no record of the reasons orally stated.

The trial judge's statements, as quoted, are not an accurate appraisal of the situation. A trial judge has always had, and always will have, the power in the exercise of his discretion to grant a new trial.

In *Snyder v. General Elec. Co.* (1955), 47 Wn. (2d) 60, 62, 287 P. (2d) 108, we said:

"We have always recognized and all our decisions have proceeded upon the principle that a trial court has the inherent power to grant a new trial if, in the exercise of its sound discretion, it is satisfied that substantial justice has not been done, even though in the past that was not listed by rule or statute as one of the grounds for a new trial. . . ."

Indeed, we have insisted that the trial court has not only the power but the duty to grant a new trial when convinced that substantial justice has not been done. *Severns Motor Co. v. Hamilton* (1950), 35 Wn. (2d) 602, 214 P. (2d) 516; *Potts v. Laos* (1948), 31 Wn. (2d) 889, 200 P. (2d) 505; *Brammer v. Lappenbusch* (1934), 176 Wash. 625, 30 P. (2d) 947.

What the trial judge really meant was not that he did not have the power to grant a new trial, but that the exercise of his discretion in granting it was subject to review by the Supreme Court and that our opinions are tendentious of reversal in such a situation.

It is unfortunate that trial judges should have reached the state of mind disclosed by the quoted statements of the trial judge in this case, but it is understandable. Two recent surveys of our cases have been made, each entirely independent of the other, one by a member of this court and one made for the Judicial Council by Professor Philip A.

Trautman of the University of Washington Law School (see 37 Wash. L. Rev. 367 [autumn 1962 issue]).  They arrive at the identical conclusion:  That this court has not given sufficient latitude to the discretion of the trial courts in the granting of new trials, particularly where the trial court has tried to make clear that factors outside the record have influenced its determination.

To use an analogy from the baseball world:  The official scorer has been calling too many of the close ones errors instead of hits; but, to continue the same analogy, this does not excuse the fielder from failing to make an all-out effort on every chance, merely because he believes it will be called an error by the official scorer if he touches it but doesn't succeed in holding it.

In short, it is our hope that trial judges who believe, for whatever reason, that substantial justice has not been done will grant new trials, giving their reasons therefor in some detail.  Should this court then reverse any trial judge, and the end result be a denial of substantial justice, the onus will be upon us and not on the trial judge.

We point out again, as we have earlier, that the record before us does not contain the purported statements of the trial judge, which have occasioned our comment.